SO ORDERED.

SIGNED this 11th day of March, 2025.



_____
Mitchell L. Herren
United States Bankruptcy Judge

DESIGNATED FOR ONLINE PUBLICATION

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

IN RE:

WEYLIN L. PARIS and
ALICIA N. PARIS,

              Debtors.

Case No. 22-10508
Chapter 7

DARCY D WILLIAMSON, Trustee,

              Plaintiff,

vs.

Adv. No. 23-5020

BRANDON L. PARIS,

              Defendant.

Memorandum Opinion and Order
Granting Judgment for Defendant

The difference between an innocent but poorly documented property conveyance between family members and a fraudulent conveyance designed to thwart creditors sometimes depends on the perspective of the beholder. Such is the case with a transfer of property between members of the Paris family.[1]

More than fifteen years ago Debtor Weylin Paris purchased real property from his grandfather and then secured a mortgage in his name on that property. Weylin lived there with his brother, Defendant Brandon Paris, for several years. In 2013, when Weylin was preparing to marry Debtor Alicia Paris, who was also then living in the home, Weylin moved out, leaving Brandon to reside in the house in exchange for $8,000 in cash and "taking over" the mortgage. In 2017, Weylin and Alicia deeded the property to Brandon after Weylin and Brandon's mother, who was completing the parents' estate planning, asked the family attorney to formally document the transfer of the property from Weylin to Brandon.

When Weylin and Alicia filed bankruptcy in 2022, Plaintiff Darcy Williamson, Chapter 7 Trustee, initiated this adversary proceeding against Brandon, seeking to stand in the shoes of a creditor and avoid the transfer of the property from Weylin to Brandon under 11 U.S.C. § 544(b) as a fraudulent conveyance.[2] After a trial on the merits, the Court finds that although the Paris family might have avoided much uncertainty by better documenting the transactions surrounding the transfer of the property, the Trustee has not proven

---

[1] Because many of the individuals noted herein share the same surname, the Court will refer to the individuals by first name.

[2] Future statutory references are to the Bankruptcy Code, title 11, unless otherwise specified.

2

that the transfer was made for a reason that would allow a creditor, or the Trustee standing in the shoes of a creditor, to set it aside. Accordingly, the Court enters judgment for Brandon Paris.[3]

## I.    <u>Procedural History</u>

Weylin and Alicia filed a Chapter 7 bankruptcy petition on June 28, 2022. Debtors were granted a discharge on November 18, 2022. About three months later, on February 9, 2023, Rocket Mortgage filed a motion to compel the Trustee to abandon the property located at 1315 50th Street South, Oxford, Kansas (the "property"). In the motion, Rocket Mortgage alleged a default, although a default amount was not stated. The total amount owed at the time the motion was filed was said to be $60,472.46. Rocket Mortgage valued the property at $110,000, based on "an appraisal provided by the Movant," but provided no evidence of that appraisal with its motion.[4] The Trustee objected to the motion to compel, arguing the property was not of inconsequential value to the bankruptcy estate because there was equity in the property.

The Trustee then filed this adversary proceeding against Brandon, seeking to avoid the transfer of the property from Weylin to Brandon. Summarized, under § 544(b), the Trustee seeks to "stand in the shoes" of the Internal Revenue Service to avoid the alleged fraudulent transfer of the property under 28 U.S.C. § 3304(b) of the Federal Debt Collection Procedures Act of 1990 (FDCPA), and 26 U.S.C. § 6901

---

[3] The Trustee appeared by her attorney J. Michael Morris. Brandon appeared by his attorney Martin J. Peck.
[4] Case No. 22-10508, Doc. 28 p. 2 ¶ 5.

3

of the Internal Revenue Code. Brandon argues the property was not fraudulently transferred, but even if it was the Trustee cannot recover the property from him because he uses it as his homestead and as such, it is exempt from recovery under § 3014 of the FDCPA and § 6334 of the Internal Revenue Code. After denying Brandon's motion for summary judgment based on the claim of a homestead exemption, the Court conducted a trial.

## II.    <u>Findings of Fact</u>

By deed dated November 24, 2008, Weylin purchased the property from his grandfather. It consists of a farmhouse and outbuildings on 3.8 acres in a rural area of Sumner County, Kansas. Weylin had previously rented it from his grandfather.

Weylin did not remember the exact price he paid his grandfather, but thought it was approximately $60,000. About two and a half years after he purchased the property, on February 5, 2011, Weylin refinanced the note securing it with Quicken Loan, now Rocket Mortgage. At that point in 2011, the refinanced amount was $64,387.

Around the same time, Brandon moved into the house with Weylin. Weylin made the mortgage payments and Brandon paid the utilities and other bills and helped around the property. At a later time Weylin met Alicia, and she also moved into the house.

Soon after, Weylin and Alicia became engaged and planned to move out and purchase their own home. Weylin and Brandon both testified to their conversations—and agreement—at this time. Weylin testified the brothers agreed

4

that when he moved out Brandon would stay and "take over" the mortgage and give Weylin $8,000 in cash to use as a down payment on Weylin and Alicia's new residence. Brandon similarly testified the brothers agreed he would contribute $8,000 toward the down payment on Weylin and Alicia's new house and take over the mortgage on the property, but Brandon additionally testified the brothers agreed that once Brandon paid off the mortgage, the property would become his.[5]

On February 6, 2013, Weylin signed a loan application to purchase his new property with Alicia. On that application he disclosed his assets: the $8,000 held as cash; a 2002 Chevrolet truck; two motorcycles; and the property at issue in this proceeding, which he valued at $85,000.[6] No testimony or other evidence was provided about the basis for the $85,000 valuation on that loan application. Weylin and Alicia were approved for the new loan, moved out of the property shortly thereafter, and were married in May 2013.

As agreed, after Weylin and Alicia moved out Brandon continued living on the property. The mortgage billing statements, still in Weylin's name, continued to be mailed to the house. Brandon simply became the individual making the payments—sometimes by check, mostly by money order but always in Brandon's name from Brandon to Rocket Mortgage, which continued to hold the note and

---

[5] Alicia simply testified she did not know the details of the brothers' agreement, and as far she knew she and Weylin no longer lived in the property and Brandon was responsible for it.
[6] Weylin also disclosed the receipt of $600 per month in "gross rental income" on the loan application, Def.'s Ex. C p. 2, and testified this was not income from Brandon, but rather, there had been another roommate that lived at the property for a while, although he could not remember the timeline of when that roommate moved in or out or any other details.

5

mortgage with Weylin. No attempt was made to assign the mortgage to Brandon at that time.

This situation continued for several years. Then, in 2017, Weylin and Brandon's parents began preparing testamentary documents with a local attorney. Weylin and Brandon's mother suggested to them to have the parents' attorney draft a quit claim deed for the property so Brandon would be protected if something happened to Weylin.

The brothers agreed, and Weylin and Alicia signed a quit claim deed, dated December 30, 2017, transferring the property to Brandon "for no consideration." The attorney who drafted the quit claim deed testified he prepared the "form document" at the request of Weylin and Brandon's mother, who informed him the property "belonged" to Brandon. The deed was then filed with the Register of Deeds in Sumner County on January 10, 2018 (the "2017 QCD").

At the time the 2017 QCD was executed, the financial condition of Weylin and Alicia is not entirely clear. The Court was given no information about Weylin or Alicia's income or their overall financial status at the time of the 2017 QCD.[7] Instead, the Trustee provided a small glimpse of Weylin and Alicia's financial condition at that time by highlighting debts disclosed in Debtors' Schedules and

---

[7] 2020 is the earliest year the Court has income information for Weylin and Alicia. According to their Statement of Financial Affairs, Weylin and Alicia reported gross income from employment in 2020 of only $19,497 for each, and in 2021, they earned $43,308 and $13,512, respectively. When Weylin and Alicia filed for bankruptcy, they disclosed relatively new employment: Weylin had been working at his then-current employer for only five months, grossing $3,481.50 per month; and Alicia had been working at her then-current employer for nine months, grossing $2,762.50 per month.

6

Statement of Financial Affairs (discussed below) that were potentially incurred before or after the 2017 QCD was executed.

Debtors' Schedule E/F, disclosing creditors with unsecured claims, provides detail about their debts owed at the time of their 2022 petition. Most of the listed debts were incurred after the 2017 QCD. The only debts incurred prior to the 2017 QCD were student loans from 2003 and 2017, two medical bills from 2014, and one loan of Weylin's from a custom harvesting business he operated as a second job from 2015 to 2018. Excluding each Debtor's student loans[8] and the mortgage on the property,[9] only a very small amount of the total unsecured debt listed on Schedule E/F was acquired prior to the 2017 QCD.[10]

Additionally, Weylin and Alicia owe the Internal Revenue Service, according to its Proof of Claim filed in their bankruptcy case, $7,894.36 as estimated taxes and interest for the 2017 tax period.[11] There is no evidence Debtors knew of the

---

[8] Weylin owes $22,747 to Navient, incurred in 2003, and Alicia owes $34,752 to Great Lakes Educational Loan Services, incurred in 2017.

[9] Regarding this debt, the Schedule E lists the creditor as Quicken Loans, states $59,157 is owed and the debt was incurred "prior to 2010," and states: "mortgage obligation on real estate no longer owned by debtor." Case No. 22-10508, Doc. 1 p. 24 ¶ 4.13.

[10] Debtors' Schedule E lists 2014 debts to Kansas Joint & Spine Specialists and Orthopaedic & Sports Medicine in unknown amounts. *Id.* at 23 ¶ 4.10. The Schedule E also lists a 2017 debt to PrairieLand Partners LLC of $4,773.58. *Id.* at ¶ 4.11. The post-quit claim deed debt is listed as follows: 2018, debt owed to RCB Bank of $9,200; 2019, debt owed to Cash Net USA of $3,200; 2020, debt owed to Ascension Medical Group Via Christi of $124, Capital One of $6,962, Kansas Turnpike Authority of $278.32, Panhandle Federal Credit Union of $3,000, Speedy Cash of $3,131.29, Union State Bank of $7,729.19, Wesley Medical Center of $142.04, William Newton Hillside Family Medicine of $168.50, William Newton Memorial Hospital (stated as incurred 2020 to 2021) of $10,614, and William Newton Memorial Hospital of $829.25; 2021, debt owed to Kansas Department of Revenue of $876, Cash Net of $1,246.17, RCB Bank of $1,200, and Winfield Veterinary Hospital of $430.78; and 2022, debt owed to Ace Cash Express of $431.25, and SNAP Finance of $831.17. Without knowing the "unknown" amounts owed to the creditors listed for 2014, it is difficult to provide a percentage of the amount of debt incurred prior to the 2017 QCD versus after its execution, but simply looking at this list, grouped by date, informs the Court that Debtors' financial situation deteriorated in mid-2020, more than two full years after the execution of the 2017 QCD.

[11] This is just a portion of Weylin and Alicia's tax debt owed to the IRS, as discussed below.

7

debt at the time the 2017 QCD was executed; the tax year would not yet have been complete, and the amount is estimated.

The Trustee also highlighted the existence of a few collection lawsuits listed on Debtors' Statement of Financial Affairs. Ultimately, however, which collection suits were pending at the time of the 2017 QCD is unclear. For example, Debtors' Statement of Financial Affairs discloses one collection suit from *2016* (Case No. 2016-LM-000686),[12] but then also says it was a limited action suit filed on July 9, *2019*. The Trustee's Exhibits then show a case filed July 9, 2019, seeking collection of small amounts from dates of medical services in 2014 and 2016.[13] Weylin testified one of those dates of service corresponded with the birth of Weylin and Alicia's first child, but did not know any details about the second date of service. Regarding Case No. 2016-LM-000686, Weylin remembered no details about the suit, other than it was probably a collection suit. The 2019 suit had obviously not been filed when the 2017 QCD was executed on December 30, 2017. All the Court can say definitively is there may have been one collection suit filed against Weylin and Alicia in 2016, but it is not clear whether the amounts were material or if the lawsuit was still pending on December 30, 2017.

During the Covid-19 pandemic Rocket Mortgage contacted Weylin about modifying the mortgage. Weylin explained he did not seek out the loan modification

---

[12] Case No. 22-10508, Doc. 1 p. 42-43 (Statement of Financial Affairs, Part 4, showing Case No. 2016-LM-000686, William Newton Memorial Hospital v. Paris). The Statement of Financial Affairs also disclosed a suit from Union State Bank against Weylin, filed June 25, 2020. *Id*. and Pl.'s Ex. 5 (Case No. 2020-LM-001042-A). But the suit states it is for debts *incurred* in 2018, with a *default* in 2019—all of which occurred after the 2017 QCD was executed on December 30, 2017.

[13] Pl.'s Ex. 5 (Case No. 2019-LM-001207-W, filed July 9, 2019, William Newton Memorial Hospital v. Paris).

8

at Brandon's request and Brandon confirmed he did not know at the time that Weylin entered into the modification. Weylin completed the modification because he knew Brandon's hours at work had been reduced and Brandon was facing reduced income. Weylin signed the loan modification with Rocket Mortgage in October 2021.

Both Weylin and Brandon testified they talked to Rocket Mortgage at different points about switching the mortgage from Weylin to Brandon. Weylin remembered talking to Rocket Mortgage two or three times that he could recall since 2015, about having the mortgage switched to Brandon's name. Brandon testified he attempted to have the mortgage put in his name after 2017. Yet, their attempts to transfer the mortgage were not successful and Weylin remained on the mortgage.

After the 2021 loan modification, Brandon continued to reside on the property, paying the modified mortgage. At the time of trial, he was two months behind on the mortgage but continuing to make payments. Weylin and Alicia did not make a payment on the mortgage after moving out in 2013.

No party disputes the mortgage on the property contains an "Acceleration of Debt" clause that permits Rocket Mortgage to require immediate payment in full of its secured debt if the property is sold without creditor approval. Rocket Mortgage has not accelerated the debt but has filed a motion to compel the Trustee to abandon the property.

Both parties also presented testimony concerning the value of the property. The Trustee presented an exhibit of the recent Sumner County assessed valuations

9

and appraised values. According to the assessment, the property's appraised value was $56,910 in 2021.[14] In 2022, the year Debtors filed their bankruptcy petition, the property's appraised value decreased to $55,600.[15] Although the county appraisal or assessed valuation for 2017 was not presented at the trial, the county tax documents state the assessed valuation of the property in 2018 was $5,854. According to Kan. Stat. Ann. § 79-1439, the assessed tax valuation is calculated by multiplying the fair market value as of January 1 by the percentage of value set by statute, which for real property such as at issue in this case is 11.5 percent.[16] So, the Court, using Kan. Stat, Ann. § 79-1439, calculates the appraised value of the property in 2018, according to the county appraiser's office, was approximately $50,900.[17]

Additionally, Brandon hired Kenneth Patterson to give an opinion on the market value of the property. Mr. Patterson, who has a lengthy career in real estate, prepared a letter opinion providing a comparative market analysis of the price that could be obtained if the property was sold on the date of his analysis, July 12, 2023. That value was $95,000 to $115,000, with an expected value of $105,000.[18]

Mr. Patterson testified it was difficult to assess property value looking backward in time. His general belief was the Covid-19 pandemic (beginning in 2020) inflated property values ten to fifteen percent in some cases. Looking backwards

---

[14] Pl.'s Ex. 15 p. 4.
[15] *Id.*
[16] Kan. Stat. Ann. §§ 79-1439(a)(1), (b)(1)(A).
[17] The appraised value is the market value multiplied by the assessment ratio of 11.5%, then divided by 100, i.e., $5854 = ($50.900 * 11.5)/100.
[18] Pl.'s Ex. 11 p. 1.

10

from his 2023 valuation, he agreed a value of $85,000 for the property (the amount Weylin estimated for value in 2013 when seeking his mortgage on his new home with Alicia) would be "reasonable" for 2017. But he also testified that without seeing the property at the time, it would be difficult to provide an accurate value. Such an increase in value each year for this property would be inconsistent with the *reduction* in value by the county appraiser from 2021 to 2022.

Weylin testified the $85,000 value listed on his 2013 loan application had probably decreased by 2017, due to the age of the home and condition of the sheds on the property. Brandon likewise testified that based on his understanding of land values surrounding the property, he believed a value of $50,000 to $60,000 would be fair; Brandon's assessment is thus consistent with the 2018 county assessed value and the 2021 and 2022 county tax appraisals.

### III. **Conclusions of Law**

#### a. **Jurisdiction**

This is a core proceeding to determine, avoid, or recover a fraudulent conveyance, which arises under title 11, over which this Court has subject matter jurisdiction.[19] Venue is proper in this District.[20]

---

[19] 28 U.S.C. §§ 1334(b), 157(a), (b)(1) and (b)(2)(H), and Amended Order of Reference, D. Kan. S.O. 13-1.
[20] 28 U.S.C. § 1409(a).

11

### b. Burden of Proof

The Trustee bears the burden to establish fraud by clear and convincing evidence to support her § 544(b) claims.[21]

### c. Overview of the Law

The Trustee seeks to avoid the transfer of the property and recover the same from Brandon under § 544(b) and § 550(a) by stepping into the shoes of the IRS and pursuing claims under 28 U.S.C. § 3301 of the FDCPA, or 26 U.S.C. § 6901 (utilizing the Kansas Fraudulent Transfers Act (KUFTA), found at Kan. Stat. Ann. § 33-201 *et seq.*).[22]

Section 544(b)(1) provides that a trustee "may avoid any transfer of an interest of the debtor in property . . . that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502." Section 544(b) "grants the trustee the avoidance powers held by creditors of the estate when the case was filed," i.e., the "triggering creditor."[23] Whatever rights held by the triggering creditor to avoid transfers under applicable law are exercisable by the trustee.[24]

---

[21] *Rajala v. Martin, Jr., (In re Convenience Xpress, Inc.)*, 508 B.R. 215, 220 (Bankr. D. Kan. 2014); *see also Williamson v. Smith (In re Smith)*, Ch. 7 Case No. 19-40964, Adv. No. 22-07002, 2022 WL 1814415, at *3 (Bankr. D. Kan. June 2, 2022) (the "trustee bears the burden to demonstrate the existence of an actual creditor with an allowable avoidance claim" under § 544(b)).

[22] *In re Smith,* 2022 WL 1814415, at *4 (concluding the IRS, and thus the Trustee, may pursue claims under the KUFTA because "[t]he tax code 'was not intended to create a body of substantive transferee liability law in addition to the existing federal and state statutes'") (quoting Saltzman & Book, *IRS Prac. & Proc.* § 17.01 (2022)).

[23] *Id.* at *3 (citing 5 *Collier on Bankruptcy* ¶ 544.06[1] (Richard Levin & Henry J. Sommer eds., 16th ed. 2022).

[24] *Id.*

12

Thus, the Trustee must first show the IRS is a creditor holding an unsecured claim that is allowable under § 502—a triggering creditor. As discussed above, the IRS filed Proof of Claim #5, reporting it is owed $12,482.36, of which $4,588 is owed as estimated taxes and interest thereon for the 2020 tax period, and $7,894.36 is owed as estimated taxes and interest for the 2017 tax period. The claim has not been amended and Debtors have not objected to it. Under § 502(a), a filed claim is deemed allowed unless a party objects.[25] Thus, the IRS claim is deemed allowed, and the IRS is a creditor in whose shoes the Trustee may stand.

The Trustee must then show the transfer would be "voidable under applicable law" by the IRS. For that purpose, as noted above, the Trustee uses the FDCPA, 28 U.S.C. § 3301, or Kansas law, Kan. Stat. Ann. § 33-201, via 26 U.S.C. § 6901(a)(1)(A).[26] Because the language of both statutes is nearly the same, the Court will quote and discuss the FDCPA, unless noted.

Section 3304(b) of the FDCPA governs claims for actual fraud and constructive fraud as to debts to the United States. Section 3304(b)(1) of title 28 provides in pertinent part:

> [A] transfer made or obligation incurred by a debtor is fraudulent as to a debt to the United States, whether such debt arises before or after the transfer is made or the obligation is incurred, if the debtor makes the transfer or incurs the obligation—

---

[25] Section 502(a) provides "a claim or interest, proof of which is filed under section 501 of this title, is deemed allowed unless a party in interest . . . objects."

[26] Section 6901(a)(1)(A) of the Internal Revenue Code, title 26, establishes liability for transferees of property of a taxpayer. This section does not itself establish potential transferee liability but permits the IRS to rely on applicable state law for that purpose. R. Stephen McNeill, *Avoiding the Unavoidable: A Practitioner's Guide to Federal Governmental Creditor Fraudulent Conveyance Actions*, 92 Am. Bankr. L.J. 335, 338 (2018); *see also supra* note 20. The Trustee can therefore look to the KUFTA to recover the transferred property.

13

(A) with actual intent to hinder, delay, or defraud a creditor; or

(B) without receiving a reasonably equivalent value in exchange for the transfer or obligation if the debtor—

(i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(ii) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

The FDCPA then provides factors for determining "actual intent" under subsection (A), which will be discussed in more detail below.[27]

### d. Date of Transfer and Statute of Limitations

One area of difference between the FDCPA and the KUFTA is the statute of limitations for each. In the FDCPA, a claim is extinguished if not brought within six years after the transfer for both actual and constructive fraud.[28] For actual fraud only, § 3306 provides that a later action may be brought within two years after the

---

[27] As noted, the relevant language from the KUFTA is very similar. Under Kan. Stat. Ann. § 33-204(a):

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:(1) With actual intent to hinder, delay or defraud any creditor of the debtor; or(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:(A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or(B) intended to incur, or believed or reasonably should have believed that such debtor would incur, debts beyond such debtor's ability to pay as they became due.

Like the FDCPA, the KUFTA then provides factors for "determining actual intent."

[28] 28 U.S.C. § 3306(b)(1)-(2) ('extinguished unless action is brought . . . within 6 years after the transfer was made or the obligation was incurred").

14

transfer could have been reasonably discovered.[29] Under § 6502(a)(1) of the Internal Revenue Code, there is a ten-year statute of limitations from the date of assessment.[30]

This means the date the transfer of the property occurred is important in determining whether the Trustee's cause of action is timely. Brandon argues the transfer occurred in March 2013, when he claims to have received equitable title to the property as a result of an oral contract for deed between himself and Weylin. Under Kansas law, a contract for deed is an agreement between the owner/seller to convey title when the purchaser has paid a specific price and also performed other duties under the contract.[31] The purchaser takes possession when the contract is executed and becomes the equitable owner of the property, and the seller retains legal title as security to protect future payments.[32]

Generally, an oral contract for the transfer of property is ineffective under the Statute of Frauds and would arguably not transfer title of any kind.[33] However,

---

[29] *Id.* § 3306(b)(1) ("under section 3304(b)(1)(A) within 6 years after the transfer was made or the obligation was incurred or, if later, within 2 years after the transfer or obligation was or could reasonably have been discovered by the claimant").

[30] Section 3502 of title 26 states where a tax assessment has been timely made, "such tax may be collected by levy or a proceeding in court . . . begun within 10 years after the assessment." There is some dispute in the case law whether a trustee stepping into the shoes of the IRS is subject to the same ten-year limitation, or if, to the contrary, the state law limitation period applies to the trustee proceeding under state law in the shoes of the IRS under § 544(b). The majority position concludes "when pursuing a claim under the Kansas UFTA by stepping into the shoes of the IRS [the trustee] is not subject to the Kansas four year look back period," but is instead able to use the ten-year period from the Internal Revenue Code. *In re Smith*, 2022 WL 1814415, at *6 (discussing cases and agreeing with majority position). Because of the conclusions made by this Court concerning the time of the transfer at issue in this case, this Court need not weigh in on the matter.

[31] *In re Miller*, 656 B.R. 281, 290 (Bankr. D. Kan. 2023).

[32] *Id.* (citing *Graham v. Claypool*, 26 Kan. App. 2d 94, 95-96, 978 P.2d 298, 299 (Kan. 1999)).

[33] *See Bank of Alton v. Tanaka*, 247 Kan. 443, 453, 799 P.2d 1029, 1036 (Kan. 1990); Kan. Stat. Ann. § 33-106 ("No action shall be brought whereby to charge a person upon … any contract for the sale of lands, tenements, or hereditaments, … unless the agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing").

15

an oral agreement may be enforceable despite the Statute of Frauds if the party (here Brandon) can show that the agreement should be enforced for equitable reasons such as partial performance.[34] To satisfy partial performance, the contract must be fully made and completed in every respect, except for the writing, and the oral agreement must be certain, clear, unambiguous, and unequivocal.[35] Like any contract, there must be a meeting of the minds on all essential elements to form a binding oral contract.[36] This element and other terms of the oral contract may be proven by the parties' acts or the surrounding circumstances.[37]

Here, there was no meeting of the minds in 2013 between the brothers as to the timing of the transfer of ownership for the property, as evidenced by their different and contradictory perspectives of the 2013 events. According to Brandon, he would own the property once he paid off the outstanding mortgage. Weylin's impression was Brandon would take over the mortgage payment and reside on the property; there was no mention of transferring his ownership interest to Brandon. Indeed, although the parties eventually entered into the 2017 QCD, there is no indication this was their intent in 2013. Because there was no meeting of the minds as to transferring an ownership interest in 2013 when Brandon remained in the property and took over the mortgage payments, the Court finds there was no oral

---

[34] *See Bank of Alton v. Tanaka*, 247 Kan. at 452-53 ("[T]he basis for removing the oral agreement … is that one party has relied upon the agreement to his detriment and gross injustice would result if the oral agreement was not enforced.").
[35] *Id.* at 453.
[36] *Unified Sch. Dist. No. 446 v. Sandoval*, 295 Kan. 278, 282, 286 P.3d 542, 546 (Kan. 2012).
[37] *Id.*

16

contract between Brandon and Weylin such that Brandon would have become the equitable owner in 2013.

This means the earliest the transfer could have occurred was at the end of 2017 when Weylin and Alicia executed the 2017 QCD, making the Trustee's claims timely under both the FDCPA and the KUFTA.

### e. **Actual Fraud under the FDCPA and the KUFTA**

To determine whether Weylin had the actual intent to defraud under 28 U.S.C. § 3304(b)(1)(A) and K.S.A. § 33-204, the Court may consider, among other factors, whether:

1. the transfer or obligation was to an insider;
2. the debtor retained possession or control of the property transferred after the transfer;
3. the transfer or obligation was disclosed or concealed;
4. before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
5. the transfer was of substantially all the debtor's assets;
8. the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
9. the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.[38]

The Trustee argues the above factors are satisfied as (1) Brandon was an "insider"; (2) Weylin retained some control because his name remained on the mortgage and billing statements and he entered into the loan modification

---

[38] 28 U.S.C. § 3304(b)(1)(A); KSA § 33-204(b). Both the FDCPA and the KUFTA provide for four additional factors: "the debtor absconded" (factors (F) in FDCPA and (6) in KUFTA); "the debtor removed or concealed assets" (factors (G) in FDCPA and (7) in KUFTA); "the transfer occurred shortly before or shortly after a substantial debt was incurred" (factors (H) in FDCPA and (10) in KUFTA); and "the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor" (factors (K) in FDCPA and (11) in KUFTA); however, those factors are inapplicable to the facts of this case.

17

agreement after executing the 2017 QCD; (3) Rocket Mortgage was not informed of the 2017 QCD; (4) Weylin and Alicia had debt collection litigation pending against them; (5) the property was the last non-exempt asset of any value; (8) Weylin and Alicia did not receive reasonably equivalent value since the 2017 QCD stated that it was given "for no consideration;" and (9) Weylin and Alicia were insolvent.[39]

Factor (1) could support a finding of intent to defraud since Brandon is an "insider" as defined in 28 U.S.C. § 3301(5)(A)(i) and Kan. Stat. Ann. § 33-201(g)(1)(A), as he is a relative (brother) of Weylin, who is an individual debtor.

Considering factor (2), the mere fact the mortgage and statements remained in Weylin's name does not mean Weylin maintained control over the property. As the parties explained, Weylin had little to do with the property after 2013; Brandon took over the mortgage payments, maintained the property, and resided there. Although Weylin exercised some control over the property in entering into the loan modification agreement, that appears to be the only time Weylin handled anything related to the property after 2013. For these reasons, this factor does not weigh in favor of a finding there was an intent to defraud.

As for factor (3), the 2017 QCD was not "concealed" from Rocket Mortgage; it was filed with the Register of Deeds office in Sumner County and became a matter of public record such that anyone, including Rocket Mortgage, could ascertain who owned the property. The facts surrounding this third factor do not tend to establish fraudulent intent on Weylin's part.

---

[39] Doc. 76 p. 8.

Regarding factor (4), the Trustee asserts the 2017 QCD was motivated by collection actions that occurred in 2016 and 2019. However, the timing of the actions appears to be nothing more than coincidence, and the mere existence of them—without more—does not establish that Weylin, by executing the 2017 QCD, intended to defraud his creditors. In addition, only the 2016 action could have been pending at the time of the QCD, but the Court has no evidence of the actual status of that action or Weylin's knowledge about it at the time of the 2017 QCD. Further, the 2019 action involved a small amount of debt from 2014 and 2016, but that relatively small debt that resulted in the 2019 collection action was not shown to be any impetus for the 2017 QCD.

Factor (5) was not proven because there is very little evidence establishing what assets Weylin and Alicia owned in 2017. Without more, it is difficult for the Court to determine whether, in transferring the property, Weylin and Alicia transferred all or substantially all their assets. Thus, this fifth factor for consideration does not tend to prove fraudulent intent.

For factor (8), in order to determine if the 2017 QCD was transferred in exchange for "reasonably equivalent value", the Court must consider the value of what was transferred and compare it to what was received.[40] An important element

---

[40] *Gunsalus v. Ontario City (In re Gunsalus)*, 613 B.R. 1, 8 (Bankr. W.D.N.Y. 2020) (internal citations omitted); *Redmond v. SpiritBank (In re Brooke Corp.)*, 541 B.R. 492, 510 (Bankr. D. Kan. 2015) (quoting *LTF Real Estate Co., Inc. v. Expert South Tulsa, LLC (In re Expert South Tulsa, LLC)*, 522 B.R. 634, 652 (10th Cir. BAP 2014)). Under Kan. Stat. Ann. § 79-503a, "fair market value" is defined as "the amount in terms of money that a well informed buyer is justified in paying and a well informed seller is justified in accepting for property in an open and competitive market, assuming that the parties are acting without undue compulsion." KSA § 79-503a; *see also In re Equalization Appeal of Kan. Star Casino, L.L.C.*, 62 Kan. App. 2d 443, 459 (Kan. App. 2022).

of reasonably equivalent value is the fair market value.[41] The date for defining reasonably equivalent value is the date of the transfer.[42]

The Trustee relies on the 2023 valuation made by Mr. Patterson which valued the property in 2023 at $105,000. The Trustee also produced the county property tax assessments from 2021 to 2022, valuing the property at $56,910 and $55,600 respectively. Mr. Patterson acknowledged he could not work backwards into a confident opinion about the value in 2017 simply by assuming a ten to fifteen percent increase in the value of the property during and after the Covid pandemic. Indeed, it appears the county *reduced* its appraised value on the property between 2021 and 2022, which would cast even further doubt on the ability to prove the 2017 value from a 2023 appraisal, as would the county's appraised value of $50,900 in 2018. In short, neither the 2023 valuation nor the property tax records from 2018 to 2022 establish the value of the property when it was transferred at the end of 2017. However, the tax assessment values, although not necessarily the best evidence of value, are consistent with Brandon's testimony the property is likely worth $50,000 to $60,000 due to the deteriorating condition of the house and surrounding buildings.[43]

Thus, the Court—based on the information in the record—concludes the value of the property was in the range of $50,000 to $60,000 at the time of the 2017

---

[41] *In re Gunsalus*, 613 B.R. at 8.

[42] *In re Brooke Corp.*, 541 B.R. at 510.

[43] *See Ins. Co. of Pa. v. Smith*, 435 F.2d 1029, 1031 (10th Cir. 1971) ("An owner may testify as to his opinion of the value of the property."); *Unified Sch. Dist. No. 365 v. Diebold (In Re Acquisition of Prop. By Eminent Domain)*, 299 Kan. 37, 46, 320 P.3d 955, 963 (Kan. 2014) (longstanding case law recognizes a "property owner's opinion as to the fair market value is deemed relevant to the determination of [fair market value]").

QCD. Given that the amount of the mortgage in December 2017 was $56,136.84,[44] Brandon, by paying the mortgage from 2013 onward, in addition to an $8,000 cash payment in 2013, provided Weylin reasonably equivalent value in exchange for the transfer. Consideration of this factor (8) therefore fails to provide indicia of intent to defraud.

Regarding factor (9), the Trustee argues Weylin and Alicia were insolvent by pointing to various debts listed in their Schedules that were incurred around the time of the 2017 QCD, such as a delinquency balance of $4,773.58 owed to PrairieLand Partners, LLC that was incurred in 2017, after Weylin sold secured agriculture equipment at a loss. Under the FDCPA and KUFTA, a debtor is insolvent if "the sum of debtor's debts is greater than all the debtor's assets at a fair valuation."[45] Further, a debtor is presumed insolvent if they are "not paying debts as they become due[.]"[46] Yet, the Trustee fails to provide a baseline of the assets Weylin and Alicia possessed in 2017, or that the sum of Weylin and Alicia's debts was greater than their assets. Simply establishing that they had debts in 2017 and 2018 does not show that they were not paying or able to pay those debts as they became due. The Court declines to infer that one delinquent balance for the agricultural equipment proves Weylin was insolvent.

---

[44] Pl.'s Ex. 12 p. 18.
[45] 28 U.S.C. § 3302(a); Kan. Stat. Ann. § 33-202(a).
[46] 28 U.S.C. § 3302(b); Kan. Stat. Ann. § 33-202(b) ("A debtor who is generally not paying such debtor's debts as they become due is presumed to be insolvent.")

21

For these reasons, the Trustee has failed to meet her burden of proof to show Weylin and Alicia committed actual fraud under the FDCPA and KUFTA by transferring the property to Brandon.

### f. **Constructive Fraud**

To show constructive fraud, the FDCPA and KUFTA provide that a transfer made by a debtor is fraudulent if the debtor made the transfer:

> [W]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: … intended to incur, or believed or reasonably should have believed that such debtor would incur, debts beyond such debtor's ability to pay as they became due.[47]

As discussed previously, the evidence shows that by taking over the remaining mortgage and paying $8,000, Brandon provided reasonably equivalent value for the property. Further, the evidence did not establish Weylin and Alicia intended, believed, or reasonably should have believed they would incur debts beyond their ability to pay after executing the 2017 QCD. Thus, the Trustee did not meet her burden to establish constructive fraud under the FDCPA and KUFTA.

Because the evidence did not establish actual or constructive fraud, there is no need to analyze the merits of Brandon's argument the property is exempt as his homestead from recovery under § 3014 of the FDCPA and § 6334 of the Internal Revenue Code.

---

[47] 28 U.S.C. § 3304(b)(1)(B)(i)-(ii); Kan. Stat. Ann. § 33-204(b)(2)(A)-(B).

Case 23-05020    Doc# 91    Filed 03/11/25    Page 22 of 23

**IV.** **Conclusion**

For the above reasons, the Trustee failed to establish that Weylin Paris, by executing the 2017 QCD, engaged in actual or constructive fraud under the FDCPA or KUFTA. The evidence instead showed that the brothers entered into a transfer of the property for reasons unrelated to any attempt to defraud creditors. Therefore, the Trustee cannot avoid the transfer of the property to Brandon, and judgment will be granted to Brandon on the Trustee's claims.

**It is so Ordered.**

# # #